IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

**PIERRE CHATMON,**  Case Number 1:15 CV 719

    Petitioner,  Judge John R. Adams

    v.  Magistrate Judge James R. Knepp, II

**BRIGHAM SLOAN, WARDEN,**[1]

    Respondent.  REPORT AND RECOMENDATION

### INTRODUCTION

*Pro se* Petitioner Pierre Chatmon ("Petitioner"), a prisoner in state custody, filed a petition seeking a writ of habeas corpus under 28 U.S.C. § 2254 ("Petition"). (Doc. 1). Respondent Warden Brigham Sloan ("Respondent") filed a Motion to Dismiss (Doc. 10) with attached exhibits, and Petitioner filed an Opposition (Doc. 11). The district court has jurisdiction over the Petition under § 2254(a). This matter has been referred to the undersigned for a Report and Recommendation pursuant to Local Rule 72.2(b)(2). (Non-document entry dated April 30, 2015). For the reasons discussed below, the undersigned recommends the Petition be dismissed.

### FACTUAL BACKGROUND

Factual findings of state courts of appeals are presumed correct unless a petitioner rebuts them with clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Warren v. Smith*, 161 F.3d 358, 360-61 (6th Cir. 1998), *cert. denied,* 527 U.S. 1040 (1999). The Eighth District Court of Appeals, Cuyahoga County, made the following findings of fact:

---

1. Petitioner has been transferred to Lake Erie Correctional Institution and is now in the custody of Warden Brigham Sloan. As such, he is the proper Respondent pursuant to Rule 2 of Rules Governing Section 2254.

{¶ 4} Viewing the evidence most favorably to the state shows that the 16 year–old victim arrived home from school to discover that his family's house had been ransacked and their possessions stolen. The victim called his mother to report what he found, and she in turn called her other children. They met at the house and learned from friends of the victim that "word on the street" had it that one of the perpetrators was a member of a family who lived nearby. A few of the victim's family members drove to that home to confront the alleged perpetrator; the remaining family members walked to the home.

{¶ 5} The victim's mother testified that she told the alleged perpetrator's mother that her son broke into the house. Angry words were exchanged, and the alleged perpetrator's mother telephoned her son. At the same time, some of the alleged perpetrator's adult siblings appeared. When the alleged perpetrator arrived home, a fight broke out among all those present, including the mothers. An older male who was present at the home separated the mothers. This intervention caused everyone to stop fighting. Some of the victim's family ran back to their house, but the victim's mother and a few others remained on the scene.

{¶ 6} As the victim's mother remained at the alleged perpetrator's house, she saw a red car occupied by Chatmon and Torres drive up. Chatmon was related to the alleged perpetrator's family. Chatmon and Torres exited the car and ran toward those members of the victim's family who were walking home. Words were exchanged and according to the victim's mother, Torres "made a gesture like he had a gun." The victim's brother exchanged words with Chatmon, and he, too, believed that Chatmon had a gun. As the family members retreated to their house, the victim's brother said that he heard gunshots.

{¶ 7} When the victim's family returned to their house, they called the police to report the break-in. After the police left, the victim's family congregated on the front porch. They received a visit from an aunt of the alleged perpetrator who was upset that "everyone was fighting." Having obtained no satisfaction, the aunt broke off the discussion and drove away. As the aunt's vehicle turned a corner, the victim's mother saw "all these guys coming" on foot. One of the victim's family members said something that caused all ten of those on the porch to retreat into the house and call the police. The males outside the house gestured to those inside to come out, but the victim's family members remained inside for their protection. At the same time, Chatmon and Torres drove up, but they were now driving a silver car obtained in a drug deal. Guns were fired in two volleys, separated by only moments. A bullet went through the front door of the house and struck the victim in the head, leading to his death. The bullet retrieved from the victim was .38 caliber. However, a police expert testified that two different kinds of bullets were recovered from the scene, proving that two different guns were used.

{¶ 8} Some of those hiding in the house saw Torres fire a gun, but none saw Chatmon fire a gun. There was, however, an eyewitness to the shooting who testified that he saw a person wearing black and green clothing firing a gun. The eyewitness testified that he had been driving down the street where the shooting occurred, close to a local bar. He saw "someone approaching the car and just started shooting across the car, to the house across the street from the bar." Surveillance video from the bar verified that Chatmon was wearing a black and green shirt and that he carried a gun.

{¶ 9} The same eyewitness testified that he heard two volleys of gunfire that had distinctive sounds. The eyewitness believed the different sounds indicated two different types of guns were fired.

{¶ 10} When the police questioned Chatmon about the murder, he said that he was present at the scene, but took off running as soon as he heard gunshots. He said that he received a call from his cousin and learned that his family members were involved in a fight with the victim's family. He and Torres then drove to the scene, but Chatmon denied being in possession of a gun at any time when the shooting occurred.

{¶ 11} Unbeknownst to Chatmon, the surveillance video from the bar near the scene of the shooting proved his statement to be false. The video showed Chatmon taking a gun from the waistband of his trousers and checking it for ammunition. He then proceeded to the street where he joined his compatriot in calling the victim's family out of their house. The video then showed Chatmon saying something to another person and walking out of view of the camera. Moments later, the video showed the men apparently reacting to gunshots because they covered for safety and then scattered. The video showed that Chatmon was among the last to leave the scene and was carrying a gun in his hand.

{¶ 12} When shown the video, Chatmon conceded that the video showed him wearing a black and green shirt. He denied, however, that the gun he carried was operable. At first he claimed that the gun did not have an ammunition clip, but that explanation evaporated because the video showed him cocking the gun. Chatmon then explained that he was only checking to see if there were bullets in the ammunition clip. At that point, he told the police that the gun was inoperable because it lacked a firing pin, although he admitted he did not discover this fact until after the shooting and further provided no explanation for how he could discover the gun was inoperable but for firing it. He claimed that Torres was the shooter, stating that Torres saw a car parked in front of the victim's house and, thinking it belonged to someone in the victim's family, said "I'm going to lite [*sic*] this bitch up." He claimed that he was among the last to leave the scene because the gun fell out of his trousers and he stopped to pick it up.

(Doc. 10, Ex. 12).

**PROCEDURAL BACKGROUND**

The procedural history was accurately summarized in Respondent's brief; therefore, it is incorporated herein with only minor changes. (Doc. 10, at 4-8).

*Trial Court*

In September 2011, the Cuyahoga County grand jury charged Petitioner in a fourteen-count indictment. The indictment contained one count of aggravated murder (Count 1); two counts of felony murder (Counts 2-3); ten counts of felonious assault (Counts 4-13); and one count of improperly discharging a firearm into a habitation (Count 14). All counts carried a three-year firearm specification. (Doc. 10, Ex. 3). Petitioner pled not guilty. (Doc. 10, Ex. 4). A jury found Petitioner guilty of murder, felonious assault, and improperly discharging a firearm into a habitation, with associated firearm specifications. (Doc. 10, Ex. 5). On January 7, 2013, the court sentenced Petitioner to eighteen years to life in prison. (Doc. 10, Ex. 6).

*Direct Appeal*

Represented by counsel, Petitioner appealed to the Eighth District Court of Appeals on February 5, 2013. (Doc. 10, Ex. 9). He raised the following assignments of error:

1. The trial court erred when it denied Appellant's motion for acquittal under Crim.R. 29 because the State failed to present sufficient evidence to establish beyond a reasonable doubt the elements necessary to support the convictions.

2. Appellant's convictions are against the manifest weight of the evidence.

3. The trial court erred by denying Appellant's request for jury instruction on reckless homicide.

4. The admission of the autopsy photos over Appellant's objection was an abuse of discretion, violated Appellant's due process rights, and deprived him of a fair trial.

5. Comments made to the jury during closing arguments that deviated from or paraphrased legal terms, elements of the charged offenses, and legal standards defined by law violated Appellant's Fifth, Sixth, and Fourteenth Amendment rights.

4

6. The trial court erred by not calculating Appellant's jail time credit in this case.

7. The court erred when it sentenced Appellant to multiple prison terms for allied offenses of similar import.

(Doc. 10, Ex. 10). The State filed a response brief. (Doc. 10, Ex. 11). On November 27, 2013, the Court of Appeals affirmed the judgment. (Doc.10, Ex. 12).

Petitioner did not file a timely appeal to the Ohio Supreme Court. Instead, on June 12, 2014, approximately five months after the appeals period expired, Petitioner filed a notice of appeal and motion for leave to file a delayed appeal. (Doc. 10, Exs. 13, 14). To excuse his belated filing, Petitioner asserted that his appellate counsel failed to notify him of the Court of Appeals decision until one month after it was issued, December 27, 2013. (Doc. 10, Exs. 13, 14). At that point, he argued that he only had sixteen days to file a timely appeal. He conceded that counsel had made him aware of the 45-day appeal period. (Doc. 10, Ex. 14). On July 23, 2014, the Ohio Supreme Court denied Petitioner's motion for a delayed appeal and dismissed the case. (Doc. 10, Ex. 15).

*Motion for Jail Time Credit*

On April 23, 2015, Petitioner moved for 453 days of jail time credits. (Doc. 10, Ex. 7). The court granted his request on April 24, 2015. (Doc. 10, Ex. 8).

*Delayed Motion for Reconsideration-App. 26(A)*

On May 19, 2015, Petitioner, *pro se*, filed a motion for delayed reconsideration of the Court of Appeals decision pursuant to Ohio App.R. 26(A). Petitioner based his motion on *Rosemond v. U.S.,* 134 S.Ct. 1240 (2014). (Doc. 10, Ex. 16). The State opposed the motion for reconsideration as untimely because the motion was filed outside the ten-day period allowed for reconsideration. The state also argued that the motion was barred by the doctrine of res judicata.

5

(Doc. 10, Ex. 17). On June 5, 2015, the appellate court summarily denied the motion for delayed reconsideration. (Doc. 10, Ex. 18).

On September 3, 2015, Petitioner filed a notice of appeal and motion for leave to file a delayed appeal to the Ohio Supreme Court. (Doc. 10, Exs. 19, 20). In his attempt to justify his late filing, Petitioner asserted that he was not notified of the decision until one month after it was issued. He claimed that he secured a copy of the decision on August 4th through a public records request. (Doc. 10, Ex. 20). On October 28, 2015, the Ohio Supreme Court summarily denied Petitioner's motion. 2015-Ohio-4468, *7.

## FEDERAL HABEAS CORPUS

On April 6, 2015, Petitioner, *pro se*, mailed the instant Petition for a writ of habeas corpus raising the following grounds for relief:

> **GROUND ONE**: The trial court erred when it denied Appellant's Motion for Acquittal under Crim.R. 29 because the state failed to present sufficient evidence to establish beyond as (*sic*) reasonable doubt the elements necessary to support the convictions.
>
>> **Supporting Facts**: The State did not prove every element of the crimes beyond a reasonable doubt for which Petitioner was convicted.
>
> **GROUND TWO**: The trial court erred by denying Appellant's request for jury instruction on a lesser included offense.
>
>> **Supporting Facts**: Petitioner presented evidence warranting an instruction on a lesser-included offense. The failure of trial court to provide the appropriate instruction violated Petitioner's right to Due Process as he received an unfair sentence based on the evidence presented at trial.
>
> **GROUND THREE**: The admission of the autopsy photos over Appellant's objection was an abuse of discretion and violated Appellant's due process rights and deprived him of a fair trial.
>
>> **Supporting Facts**: The State improperly utilized autopsy photos to the prejudice of the Petitioner, violating his constitutional right to due process and a fair trial.

> **GROUND FOUR**: Comments made to the jury during closing arguments that deviated from or paraphrased legal terms elements of the charged offenses and legal standards defined by law violated Appellant's 5th, 6th, and 14th Amendments rights.
>
>> **Supporting Facts**: The prosecutor committed misconduct to the prejudice of Petitioner in violation of rights under the 5th, 6th, and 14th Amendments to the U.S. Constitution.
>
> **GROUND FIVE:** Trial court erred when it sentenced for offenses that were allied of similar import.
>
>> **Supporting Facts:** Petitioner was sentenced for offenses that were allied in nature. This was a clear violation of the Double Jeopardy Clause to the United States Constitution.

(Doc. 1).

## JURISDICTIONAL BAR

*Statute of Limitations*

The Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA") created a one-year limitations period for habeas petitions brought by individuals challenging their state court convictions. 28 U.S.C. § 2244(d). Under 28 U.S.C. § 2244(d)(1), the limitations period begins to run from the latest of four events:

(A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

(B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;

(C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

Applicable to this Petition, cases become final for purposes of § 2244(d)(1)(A) when the time to file an appeal has expired. *Lawrence v. Florida*, 549 U.S. 327, 333 (2007). Under Rule 6(a)(1)(A), the statutory clock starts the day after the triggering event. Fed.R.Civ.P. 6(a)(1)(A). Applied to the case at bar, the triggering event is "the expiration of the time for seeking [direct] review". § 2244(d)(1)(A); *Bronaugh v. Ohio*, 235 F.3d 280, 284-85 (6th Cir. 2000).

Here, Petitioner had 45 days from the date the Ohio Eighth District Court of Appeals affirmed the judgment of the trial court to perfect an appeal to the Ohio Supreme Court. S.Ct.Prac.R. 7.01(A)(1)(a)(i). The Sixth District affirmed his conviction on November 27, 2013; thus, the 45 days began to run on November 28, 2013, and concluded on January 13, 2014.[2] Petitioner failed to perfect his direct appeal to the Ohio Supreme Court within that period. Thus, the one year statute of limitations for AEDPA purposes began running on January 14, 2014. Absent tolling, the one year period expired on January 14, 2015.

*Statutory Tolling*

Under 28 U.S.C. § 2244(d)(2), a properly filed application for state post-conviction or other collateral relief with respect to the judgment tolls the running of the limitations period until the day the state supreme court decides the case or denies review. *Lawrence v. Florida*, 549 U.S. 327 (2007); *Isham v. Randle*, 226 F.3d 691 (6th Cir. 2000). To fall under the tolling provision, Petitioner's motion must be a qualifying state collateral action and be properly filed. *Artuz v. Bennett,* 531 U.S. 4, 8-9 (2000). However, this statutory tolling provision does not revive the limitations period, it can only serve to pause a clock that has not yet expired. *Allen v. Yukins*, 366 F.3d 396, 401 (6th Cir. 2004); *Searcy v. Carter*, 246 F.3d 515 (6th Cir. 2001). Once the limitations period is expired, state collateral review proceedings can no longer serve to avoid the

---

2. Petitioner's 45 days actually ended on January 11, 2014, a Saturday; and thus, Petitioner had until the next business day, January 13, 2014, to file his appeal.

8

statute of limitations bar. *Vroman v. Brigano*, 346 F.3d 598 (6th 2003); *Jurado v. Burt*, 337 F.3d 638, 641 (6th Cir. 2003).

Here, the statute of limitations ran from January 14, 2014, until June 12, 2014 (149 days), when Petitioner filed his motion for delayed appeal in the Ohio Supreme Court. The statute of limitations was tolled until July 23, 2014, when the Ohio Supreme Court denied the motion for delayed appeal. Importantly, a motion for delayed appeal will toll the statute of limitations but is not part of the "direct appeal" for purposes of 28 U.S.C. § 2244(d)(1). *See DiCenzi v. Rose*, 452 F.3d 465, 468 (6th Cir. 2006); *Keeling v. Warden, Lebanon Correctional Inst.,* 673 F.3d 452, 459 (6th Cir. 2012) (a motion for delayed appeal will not cause the statute of limitations to begin running anew.). The statute then ran for 216 days – the remainder of the one-year limitation – until February 24, 2015. Neither of Petitioner's subsequent motions, i.e. for jail time credit or for reconsideration, serves to toll the statute of limitations because they were filed after February 24, 2015. *See Vroman,* 346 F.3d 598. Thus, absent equitable tolling, the Petition, mailed April 6, 2015, is untimely.

*Equitable Tolling*

"[T]he doctrine of equitable tolling allows federal courts to toll a statute of limitations when 'a litigant's failure to meet a legally-mandated deadline unavoidably arose from circumstances beyond that litigant's control.'" *Keenan v. Bagley*, 400 F.3d 417, 421 (6th Cir. 2005) (*quoting Graham-Humphreys v. Memphis Brooks Museum of Art, Inc.,* 209 F.3d 552, 560-61 (6th Cir. 2000)). Petitioner bears the burden of proving an entitlement to equitable tolling. *See Griffin v. Rogers*, 308 F. 3d 647, 653 (6th Cir. 2002). Equitable tolling should only be granted "sparingly". *Solomon v. United States*, 467 F.3d 928, 933 (6th Cir. 2006).

To be eligible for equitable tolling, a petitioner must prove "1) that he has been pursuing his rights diligently; and 2) that some extraordinary circumstance stood in his way." *Pace v.*

*DiGugliemo*, 544 U.S. 408, 418 (2005). In the extreme circumstance, a petitioner can prove his entitlement to equitable tolling through a showing of actual innocence under the "miscarriage of justice" standard. *Schlup v. Delo*, 513 U.S. 298 (1995). In these cases, a credible showing of actual innocence operates to excuse procedural bars that would prevent a habeas petition. *See Souter v. Jones*, 395 F.3d 577 (6th Cir. 2005).

Petitioner did not address his entitlement to equitable tolling in his response; but instead relied on an erroneous conclusion that his Petition was timely because the one-year statute of limitations should have begun running after the Ohio Supreme Court denied his motion for delayed appeal. This is an incorrect interpretation of the law. *Supra* 8-9. Further, it is evident that Petitioner did not diligently pursue his rights; not only did he fail to timely file his direct appeal but he also waited eight months after the state court denial before filing the instant Petition. Ultimately, the Petitioner failed in his burden to prove his case warranted equitable tolling, through either the standard method or through a claim of actual innocence. As such, the undersigned recommends the Petition be dismissed as time-barred.

## CONCLUSION AND RECOMMENDATION

Following review, and for the reasons stated above, the undersigned recommends the Petition be dismissed as time-barred.

                                                                      s/James R. Knepp II
                                                              United States Magistrate Judge

*ANY OBJECTIONS* to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of service of this notice. Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. *See U.S. v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985).